Filed 3/26/26  In re S.B. CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| In re S.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SUTTER COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.S. et al.,<br><br>Defendants and Appellants. | C103702<br><br>(Super. Ct. Nos. DPSQ210000001, DPSQ210000002, DPSQ210000003, DPSQ210000004, DPSQ210000005, DPSQ210000006, DPSQ210000007 & DPSQ210000046) |

Appellant M.B. (mother) is the mother of the eight children that are the subject of these proceedings.  Appellant R.S. (father) is the father of all but the oldest child, Ma.B. Mother and father (together, the parents) separately appeal from the juvenile court's orders terminating parental rights and freeing the minors for adoption.  They raise numerous issues on appeal and join in each other's arguments.  We agree with the parents only as to their argument that the juvenile court failed to conduct a proper inquiry into the

1

minors' ancestry and, therefore, we conditionally reverse the orders and remand for compliance with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code, § 224.2).[1]

BACKGROUND

*2022 Juvenile Dependency Petitions*

On September 28, 2022, the respondent Sutter County Health and Human Services Department (the Department) filed juvenile dependency petitions pursuant to section 300 as to all eight children, the boys Ma.B., B.B., and Sam.B., and the girls N.B., Sa.B., Z.B., So.B., and F.B. Father is not the biological father of Ma.B., whose biological father is not a party to these proceedings.

The petitions alleged the parents had been involved in a prior dependency matter in Yuba and Sutter Counties in 2020. In that prior matter, it was reported that mother used a dog shock collar on the two younger brothers as discipline and to toilet train them. Additionally, the parents' house was in a dirty and unsanitary condition, and several of the children had "noticeably rotten teeth." The parents entered into a safety plan, and, in 2021, the children were returned to the custody and care of the parents, and the case was closed.

Factually, the present petitions alleged that, on September 26, 2022, two of the children were found outside unattended. Social workers responded and, based on the circumstances in the home, all children were placed in protective custody. One child, the female Sa.B., was wearing a dog harness, and the house was unsanitary and cluttered. There was brown mold in the bathroom sink, and clothes were piled in the shower. The kitchen stove was stained with food and had black spots on it. One bedroom had clothing covering the entire floor and had brown stains on the wall. There were flies swarming

---

[1]     Undesignated section references are to the Welfare and Institutions Code.

around two sleeping children.  Five of the children, the girls, had brown stains on their legs and feet, and red bite marks on their arms and legs.

On October 27, 2022, the juvenile court sustained the petitions.

*Detention, Placement, and Return of the Children to the Parents*

The Department was unable to place all eight children together.  The three boys, Ma.B., B.B., and Sam.B. were placed together in Sutter County.  As for the girls, N.B. and So.B. were placed together in Yuba County, Z.B. and F.B. were placed together in Sutter County, and the female Sa.B. was placed on her own in Yuba County.

At a detention hearing, the juvenile court appointed attorney Donald Wahlberg, Jr., to represent the children.  The court found initial removal of the children was necessary and ordered the children detained and committed to the care, custody, and control of the Department.  The court ordered visitation with the parents.

In an October 25, 2022, addendum report, the Department agreed that the parents had improved conditions in their home, and it appeared to be safe for the children. However, the Department stated that, historically, the family had not been able to make lasting changes to their behavior.  The Department also stated that the parents were not willing to engage, and seemed unwilling to take accountability for their actions.  The Department expressed concern that the parents' "lack of personal [responsibility] and resistance to working with the Department, will put the children at risk of living in similar circumstances that existed at detention."

In a disposition report dated November 10, 2022, the Department recommended that the children be ordered into the family reunification program with the parents.  At a disposition hearing on December 1, 2022, the juvenile court found that, since the removal of the children, the parents' progress had been minimal.  The court found that continued placement was necessary, and continued the supervision of the children under the Department.  The court ordered the parents into the family reunification program with the children.

An interim review report described the parents' home as clean. The parents had been consistently attending visits, and had only missed "a few." Father had been engaged and interactive with all of the children. Mother would often be off to the side with one or two children, or on her cell phone, and less engaged. Ma.B., the oldest child, often helped tend to his siblings. On March 7, 2023, the juvenile court continued the children's commitment with the Department, and found the parents' progress adequate.

At a June 1, 2023, review hearing, the juvenile court declined the request to transfer the matter to Tehama County, directed the parents to make specified improvements to their new Tehama County property, and directed the Department to inspect that property.

On June 29, 2023, the juvenile court found that the parents' progress had been adequate. The court found that placement of the children in foster care was no longer necessary, and the return of the children to the parents would not create a substantial risk of detriment to their safety, protection, or physical or emotional well-being. The court ordered the minors returned to the parents under the family maintenance program. The court also granted the transfer of the matter to Tehama County.

*2023 Supplemental Juvenile Dependency Petitions*

Eight days later, on July 7, 2023, the Department filed supplemental juvenile dependency petitions under section 387, and the juvenile court issued protective custody warrants for each child. The petitions alleged that, on July 6, 2023, at 3:15 a.m., a motorist encountered Z.B., who was one year old, and So.B., who was four years old, alone by the road. Z.B. was wearing a dog harness. The motorist and a neighbor brought the children to the family residence, where the older children were calling for them. No adults from the family home were seen.

*Detention and Placement of the Children*

A detention report stated that all of the children had been returned to the foster homes where they were previously placed. At a detention hearing on July 11, 2023, the

4

children were committed to the care and custody of the Department. The juvenile court transferred the matter back to Sutter County.

On September 15, 2023, the juvenile court sustained the July 7, 2023, petitions. On the same date, the court found that the ICWA did not apply.

At a disposition hearing on November 1, 2023, the juvenile court found the progress the parents had made to be minimal and found continued placement of the children necessary. The court ordered the parents into the family reunification program with the children.

On January 11, 2024, the juvenile court granted the request that James Vasquez be appointed as counsel for the children, replacing Wahlberg.

*Termination of Reunification Services and Adoption Assessments*

In a review hearing on February 22, 2024, the Department requested that reunification services be terminated, stating that the deficiencies in parenting skills which led to the removal of the children continued to exist. The attorney for the children agreed that returning to the parents' home would not be in the children's best interests. He requested that reunification services be terminated, and the matter be set for a section 366.26 hearing.

The juvenile court found that the parents had made minimal progress toward improving the circumstances necessitating placement. The court found that the parents lacked any real understanding of why the children were removed. The court ordered reunification services terminated. The court found that the children constituted a sibling group within the meaning of section 361.5, subdivision (a)(1)(C), and set the matter for a section 366.26 hearing.

In May 2024, the California Department of Social Services (CDSS) submitted adoption assessment reports for the children, one for each group housed together. CDSS determined that all of the children were likely to be adopted and recommended terminating parental rights and ordering adoption.

5

*Section 366.26 Report*

The section 366.26 report recommended termination of parental rights and a plan of adoption for the children.

Of the children's particular needs, the report stated that Ma.B. had no developmental concerns and did not qualify for services. B.B. had no developmental concerns but did receive services "due to his increasing maladaptive behaviors." Sam.B. had no developmental concerns and received services. F.B. had some sensory issues and speech delays, and was receiving services, but her mental health screening did not identify any concerns. Z.B., N.B., and So.B. had no developmental or mental health concerns. Sa.B. had a primary diagnosis of autism and a secondary diagnosis of speech or language impairment.

The report stated the current caregivers were willing to provide the permanency of adoption. The boys appeared happy, had emotional ties to the prospective adoptive parents, and stated that living with them was "good." They "reported a desire to remain in the care of their current resource parents." Sa.B. did not interview due to her "developmental barriers," and the other girls did not interview due to their ages.

The report noted that the parents had visited consistently, every week. Visits were "generally chaotic, with both parents struggling to maintain the attention of all of their children, whether virtual or in-person." Father engaged with the children and attempted, unsuccessfully, to regulate their behavior. Mother engaged "sporadically," but often remained quiet and frequently ordered father to attend to the children. Mother appeared alternately despondent, engaged, or demanding. In general, the report characterized the visits as lacking direction, the children would become dysregulated, and the parents struggled to manage behaviors.

F.B. and Z.B. were loud and chaotic during visits. Sa.B. wandered about, had tantrums, and yelled and screamed for attention. The mother "struggle[d] to engage with

6

her . . . ." The boys' interactions with the parents were "limited," and they spent much of the visitation time on electronic devices.

According to the Department, a CDSS report noted that, "while the children 'may enjoy parts of their visits . . . visits do not facilitate a necessary safe and healthy living environment . . . for any of the siblings.' " The parents "often do not exhibit an understanding of what is appropriate to share." The visit schedule remained frequent even though services had been terminated.

Meanwhile, the children had developed strong relationships with their caregivers, with whom they lived in stable homes. The Department stated that there "is no doubt that the children love their biological parents, but love does not equate to safety, and that is what the Department must assess in the children's best interest." The Department recommended the termination of parental rights and freeing the children for adoption.

*Addendum Reports*

Addendum report number three, dated December 3, 2024, noted that Sa.B. was experiencing increased behavioral challenges, and connected those challenges to visitation. Her resource parent stated that the child would, among other things, isolate and hide under her blanket. On one occasion, when her resource parent informed her it was a visit day, Sa.B. screamed, hit, and said no repeatedly. She also had begun drawing on the walls, which she did when struggling. Meanwhile, S.B.'s and N.B.'s caregiver reported that, after visitation, they were more anxious and impatient with each other.

Addendum report number four, dated January 7, 2025, noted that Ma.B. declined to attend one-hour virtual visits on Mondays and Wednesdays. His Thursday virtual visits were shortened from 60 to 30 minutes at his request.

Addendum report number five, dated March 6, 2025, stated the boys appeared happy in their foster home, they had good relationships with the substitute care providers and their extended family, and the substitute care providers would like to adopt them. Ma.B. was excelling in school with straight A's, B.B. was doing well socially and

7

improving academically, and Sa.B. was struggling to follow directions and keep his hands to himself. All three boys appeared more agitated around visitation. However, all three boys registered a desire to return home to the parents. If they could not do so, they preferred to remain with their current care providers. Ma.B. specified that he wanted to maintain contact with the parents. As for the girls, Sa.B. was very comfortable and calm in her placement home and was effectively using language. She was the highest functioning child in her classroom. However, she continued to experience difficulties after visits, including isolating, not letting her care provider change her, "los[ing] her words" and screaming in her sleep after visits. N.B. and So.B. were doing well academically and emotionally. However, after visits, they tended to " 'nitpick' " one another and fight, and they behaved aggressively and rudely. F.B. and Z.B. were calm and comfortable in their placement home, as contrasted with their behavior during visits, when they would scream and be agitated.

According to addendum report number six, dated April 1, 2025, the parents were having difficulty engaging with the children during virtual visits, and there appeared "to be a decline in the children's desire to engage with virtual visits." Ma.B. explained that he had wanted his Thursday virtual visits shortened to 30 minutes not because he did not want to see the parents, but because he had difficulty engaging with them for a full hour. During in-person visits, mother asked many questions and father tended to the children. The girls Sa.B., Z.B., and F.B. were continuing to experience difficulties around the time of visits. According to her resource parents, the more Sa.B. attended visits, the more she regressed in her behavior, and it took 24 to 48 hours for her to return to her "baseline" behavior. Her regressions included screaming, not using language, hitting, biting, and having difficulty sleeping. Z.B. and F.B. reported that they did not want to attend visits. Both of them had been observed crying when they were picked up for visits, and they often had a difficult time "settling" once they returned to the resource home. Reportedly, they "questioned their resource parent about . . . stay[ing] with them forever, rather than

8

returning home to the parents." The four resource families had "developed strong connections with one another, and are committed to maintaining sibling contact outside of the current scheduled visits. They often meet at local venues for ice cream, food, and/or to celebrate holidays. The resource families have committed to a minimum of once a month visitation."

*Bonding Study*

A bonding study completed for father by Dr. Elizabeth Stanton, a clinical psychologist, concluded: "[T]he children engage in healthy attachment behaviors toward Father. Father responds to their overtures, and his support was sought after when the children needed help or direction. When playing, the children welcomed Father. When it was time for departure, none of the children engaged with Father negatively. [¶] Overall, the interactions between Father and the children were positive, playful, reciprocal, and appropriate. Considering the beneficial relationship that exists between the children and their father, severing contact could be detrimental. Even if not immediately destabilizing, there may be challenges related to negotiating the ambiguous loss that can result when there is a healthy parent-child relationship that is severed without significant reason. [¶] . . . It is recommended to consider the substantial, positive relationship observed between the children and their father when making any determinations regarding the future of all parties."

*Section 366.26 Hearing Testimony*

*Ma.B.*

Ma.B. was 14 years old and was getting all A's as a high school freshman. Asked how he liked living with his foster parents, he testified that "[i]t's great," and that they took good care of him. He did not know how he felt about adoption. He was fine with being adopted by his foster mother, but he did not want to be adopted by anyone else, and he wanted his brothers adopted with him.

9

Ma.B. was afraid that, if he was adopted, he would not be able to see the parents anymore. He still wanted to see his parents. The juvenile court asked Ma.B. how he would feel if he were not to see his parents again until after he turned 18, and Ma.B. responded, "I don't know. I feel like I'd be sad for my parents. I'd be okay. I feel my parents will miss me a lot." The court asked, "[b]ut for you, would it be in your best [*sic*] to be adopted," "for you and your brothers," and Ma.B. responded, "Yeah."

The father's attorney asked if Ma.B. was fine with adoption but was afraid he would not see his parents anymore, and Ma.B. agreed. The father's attorney asked how Ma.B. would feel if he did not get to see his parents anymore, and he responded, "I don't know. At first I feel like I would cry a bit and once I get over it, I'll be okay. I'm afraid for my parents."

The father's attorney asked if Ma.B. had said he thought it was best for him to be adopted, and he responded, "Yeah." Asked why he thought it best if he were adopted, Ma.B. stated, "the parents that I have, I really like them. I want to be with them. I didn't want to stay–I don't want to go to another parent. I'd rather just get adopted than stay in foster care." When the father's attorney made clear that the juvenile court was not considering adoption by anyone other than his foster parents, Ma.B. responded, "Oh, okay. Like going with someone else? Because I've been told a lot . . . ." The father's attorney reassured Ma.B. that he would not be moving to a different place, and the court agreed and said, "[d]on't worry about that."

The father's attorney asked, "[L]et's just say for a second that you were adopted by the people that you're living with," and "you weren't able to see your parents again. Would you still want to be adopted?" Ma.B. responded, "Yeah. I don't know. Yeah. But it's hard not seeing my parents for like four years." He continued: "Like if I could say–let's say I said no, and if I was able to give a choice to see my parents, I would probably do it. Not be adopted, yeah." The father's attorney clarified, "Because you

10

want to see your parents," and Ma.B. responded, "Yeah." The thought of not seeing his parents anymore made Ma.B. sad.

Ma.B. testified that he had been told there were two options, adoption, or stay in foster care. He testified, "I wanted to see if there was an option like I if I couldn't go back home because–sorry." With some encouragement, he continued, "If I could stay with [the foster mother], and if I couldn't go back home, I would stay with [the foster mother], and if there's another choice of having to be adopted, but I can't see my parents no more. And then if that's what I was asking [his attorney] about, was if I stayed in foster care, would I still see my parents. [¶] And that's what I wanted to do, if that was possible, we're not for sure." Asked what his best-case scenario would be, Ma.B. stated, "I don't know. That's a tough one." He then stated that his number one choice "[f]or sure" was to return home to the parents. His next choice would be to stay with his foster mother and still be able to see his parents. His last choice would be to stay with his foster mother and be adopted without his parents in his life.

The father's attorney sought to clarify Ma.B.'s statement that he would not be upset with the court if the court ordered adoption despite this being Ma.B.'s least favored option. Ma.B. testified, "that's his opinion. And I can't change his choice. That's his choice. And I don't have any choice. I have a say, I can say stuff, but I can't change his choice." The father's attorney asked, "Do you know that you have a choice?" Ma.B. responded: "Yeah. But–I don't know. Do I have a choice? I don't know. I'm choosing my choice but that's if him–I don't know." Asked if he could say yes or no to adoption, what would he say, Ma.B. responded: "I would say, no. Yeah."

Ma.B would be upset and sad if he and his brothers were adopted and were not able to see their sisters, because "I really love my sisters and I really love my parents . . . ." He saw his sisters once or twice a week. Most recently, he saw them two days prior at a fast-food restaurant. Before that, it had been some time.

11

*B.B.*

B.B. was 10 years old and in the fourth grade. The juvenile court asked if he liked the foster mother, and he responded that he liked it better at the parents' house. If he had a choice, he would go back with his parents. He testified that he saw his sisters outside of the parental visits, and that he saw them the previous week at a fast-food restaurant. The time before that was "[l]ast year."

*Sam.B.*

Sam.B. was nine years old and in the third grade. He testified that his foster mother was good, and he liked living with her. If he had his choice between staying with his foster mother and going back to his parents, he would go back to the parents. Outside of the visits with the parents, he saw his sisters the previous Friday at a fast-food restaurant. He did not remember when he saw them outside of the parental visits before that, but it had been a long time.

*Sherry Scott*

Sherry Scott was the executive director of Ardent Family Services, Inc., and she had been present for seven family visits. The parents had been engaged with the children. Scott never had to encourage the children to interact with the parents, she never had to terminate a visit early, and she had never been concerned for the safety of the children.

It appeared to Scott that the parents loved the children, and the children loved the parents. When their visits began, the children ran to the parents and they embraced. They expressed their love for each other, said they missed each other, and sometimes there were tears at the end of visitation. The parties stipulated that the children and the parents were excited to see each other.

Scott testified that the visits could be "chaotic." By this, she meant that there were "a lot of kids in various ages with various interests who have to follow a lot of rules."

Scott also testified that the two younger boys were "very angry at every visit," they acted disrespectfully, and they did not respond to redirection.

*The Father*

The father testified that, during virtual visits, the children were often distracted by something above the computer monitor. There was a television directly above that monitor. He also testified that there were often technical problems during virtual visits, such as no sound and a blurry screen.

*Section 366.26 Permanency Planning*

Before discussing the juvenile court's determination, we provide the framework for section 366.26 permanency planning. The goal at the section 366.26 hearing is " 'to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] . . . '[T]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).) Thus, at the section 366.26 hearing, a juvenile court must choose one of the " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

13

The statutory exceptions apply if the juvenile court finds a "compelling reason for determining that termination would be detrimental to the child" due to the existence of the circumstances set forth in the exceptions. (§ 366.26, subd. (c)(1)(B).) One exception is the beneficial parental relationship exception, which applies when the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The three elements the parent must prove to establish this exception are: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631.) Another exception is the sibling relationship exception. This applies where the court finds there "would be substantial interference with a child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v).)

*The Juvenile Court's Ruling and Orders*

The juvenile court found that reunification services had been terminated and that all children were likely to be adopted, determinations not challenged here.

With regard to the beneficial parental relationship exception, the juvenile court noted that the parties had stipulated that the first prong was met, and that, in any event, it would have found that the parents satisfied their burden as to prong one.

Prong two was "a close call." The juvenile court concluded: "when you take a look at the age of the children, then the portion of the children['s] li[ves] that they spent with their parents as well as their other siblings, and then the positive or negative effect of the interaction between parent and child, and then the child's particular needs; again, yes, there is an attachment. It is positive. I don't know how substantial it is. Because . . . they're just as emotionally positive with the placements where they're at now. So . . . I'd say it's a 50/50. And the parents have the obligation to prove by a preponderance of the evidence, which . . . would mean 50.1. And I can't necessarily say that on prong two."

14

Turning to the third prong, the juvenile court stated that the parents' ongoing struggles with the issues that led to dependency were relevant to the benefit of continuing their relationships with the children. The parents had failed to adequately address these matters, and "failed to show that there's been a change in circumstances that would negate the need for parental rights to be terminated."

The juvenile court found that the children had developed strong relationships with their resource parents, who wanted to provide permanency. The court noted that the younger children had spent most of their lives in the resource homes. The court stated that the children deserved permanency in their current resource homes "rather than continuing to languish in foster care with a high level of visitation with the parents."

The juvenile court concluded that "the new stable home alleviates any emotional instability and preoccupation, and then provides a new source of stability that will make the loss of the parent not, at least on balance, detrimental." The court found that the parents did not meet their burden on prong three. The court denied the request for guardianship.

As for the sibling bond exception, the juvenile court stated that the relevant factors parallel those of the beneficial parental relationship exception. The court found it to be in the children's best interests that the sibling bonds continue. The court noted that, according to the attorney for the children, the placement homes intended to continue to promote the minors' sibling bonds.

Thus, the juvenile court found that the beneficial parental relationship exception and the sibling relationship exception did not apply. The court freed the children from the custody and control of the parents, terminated parental rights, and ordered adoption as the permanent plan.

DISCUSSION

I

*The Beneficial Parental Relationship Exception*

The parents argue that the juvenile court erred in finding that they did not establish the applicability of the beneficial parental relationship exception. We disagree.

As stated, the three elements the parent must prove to establish the beneficial parental relationship exception are: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631.) The party claiming the exception has the burden of establishing its applicability. (*Id*. at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).)[2]

"A substantial evidence standard of review applies to the first two elements." (*Caden C., supra*, 11 Cal.5th at p. 639.) "Substantial evidence is 'reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged . . . .' " (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.) "The third element . . . is somewhat different. . . . [T]he court must make a series of factual determinations. . . . All these factual determinations are properly reviewed for substantial evidence." (*Caden C.,* at p. 640.) "Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision is not the same as a determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the

---

[2]    Undesignated references to rules are to the California Rules of Court.

16

relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision . . . is discretionary and properly reviewed for abuse of discretion." (*Ibid*.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.) "At all proceedings under [section 366.26], the court shall consider the wishes of the child and shall act in the best interests of the child." (§ 366.26, subd. (h)(1).)

A. *Regular Visitation and Contact*

The Department stipulated, and the parties agree, that the parents had regular visitation and contact with the children, satisfying the first element.

B. *A Relationship, the Continuation of Which Would Benefit the Child*

Considering the second element, "courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C., supra*, 11 Cal.5th at p. 632; *id*. at p. 631.)

Here, the eight children range in age from the oldest, Ma.B., who was 14 years old at the time of the section 366.26 hearing, to the youngest, Z.B., who was then three years old.

When the children were detained in connection with the 2022 section 300 petition, Ma.B. was 12. With the exception of approximately eight days in the summer of 2023, when the children were briefly returned to the parents' care, the children had been in placement homes since September 26, 2022. Thus, although he had spent most of his life with the parents, Ma.B. resided in a placement home for approximately two and a half years as of the April 2025 section 366.26 hearing. At the other end of the continuum,

17

when Z.B. was removed from the parents' care in September 2022, she was approximately 10 months old, and except for those eight days in 2023, she had been in foster care ever since. By the time of the section 366.26 hearing, she had been in foster care far longer than she had been in the parents' care. All of the children had been out of the parents' care for years, and two of them had been out of the parents' care for longer than they had been with the parents.

Considering the "positive" or "negative" effects of interaction between the parents and the children, we look to the record concerning visitation. The section 366.26 report stated that visits were "generally chaotic, with both parents struggling to maintain the attention of" the children. The father engaged with the children and attempted, unsuccessfully, to regulate their behavior, while the mother engaged "sporadically." The children would become dysregulated. F.B. and Z.B. were loud and chaotic. The female Sa.B. wandered about, had tantrums, and yelled for attention. The boys' interactions with the parents were "limited," as they spent much of the time on electronic devices. The report did state that there was no doubt that the children loved the parents.

Addendum report number three noted that the female Sa.B. was experiencing increased behavioral challenges, and connected those challenges to visitation. After in-person visits, she would isolate and hide under a blanket. On one occasion, when informed that it was a visit day, she screamed, hit, and said no repeatedly. She was also drawing on the walls, which she did when struggling. After visits, So.B. and N.B. were more anxious and impatient with each other.

Addendum report number five noted that all three boys appeared more agitated around visitation times. Sa.B. continued to experience difficulties after visits, including isolating, "los[ing] her words," and screaming in her sleep. N.B. and So.B. tended to " 'nitpick' " at one another, fight, and behave aggressively and rudely after visits. F.B. and Z.B. were calm and comfortable in their placement home, but would scream and be agitated during visits.

18

According to addendum report number six, the parents had difficulty engaging with the children, and there appeared "to be a decline in the children's desire to engage with virtual visits." Sa.B., Z.B., and F.B. continued to experience difficulties around the time of the visits. The more Sa.B. attended visits, the more she regressed, including screaming, not using language, hitting, biting, and having difficulty sleeping. Z.B. and F.B. did not want to attend visits. Both had been observed crying when they were picked up for visits, and had difficulty "settling" after. They also asked about whether they could stay with the resource parent permanently rather than returning to the parents.

Dr. Elizabeth Stanton's bonding study concluded that "the children engage in healthy attachment behaviors toward Father." She opined that "severing contact could be detrimental. Even if not immediately destabilizing, there may be challenges related to negotiating the ambiguous loss that can result when there is a healthy parent-child relationship that is severed without significant reason. [¶] . . . It is recommended to consider the substantial, positive relationship observed between the children and their father . . . ."

According to the section 366.26 report, all three boys appeared happy in their placement homes, had emotional ties to the prospective adoptive parents, and stated that living with them is "good." They "reported a desire to remain in the care of their current resource parents."

In his hearing testimony, Ma.B. stated his preferences were, in descending order of desirability, returning home to the parents, remaining in his placement home but with a continuing relationship with the parents, and adoption with no ongoing relationship with the parents. The other two boys testified that, if they had their choice, they would go back to the parents. We note that "[n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Caden C.,* 11 Cal.5th at p. 634.) Further, while "[a]t all proceedings under [section 366.26], the court shall consider the wishes of the child and shall act in the best interests of the child" (§ 366.26, subd. (h)(1)),

19

a child's wishes are not necessarily determinative of his or her best interests. (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1087.)

Sherry Scott testified that the parents and the children loved each other. When their visits begin, the children ran to the parents, and they embraced. They verbalized their love for each other, they said they missed each other, and sometimes there were tears at the end of visitation. Scott also testified, however, that both younger boys were "very angry at every visit." They acted disrespectfully and did not respond to redirection. She characterized the visits as chaotic, but specified that she meant "a lot of kids in various ages with various interests who have to follow a lot of rules."

We conclude that the evidence discussed above, and in particular that related to (1) the time the children had been out of the parents' care, and (2) the negative effect of interaction on the children around visitation, constitutes substantial evidence supporting the juvenile court's determination on prong two, that the parents failed to prove the existence of a relationship, *the continuation of which would benefit the children*. On substantial evidence review, "the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874, italics omitted.)

C.      *Whether Termination Would Be Detrimental to the Child*

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 632.) "By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Ibid*.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain

20

the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship–in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.)

The evidence supported the premise that the parents loved the children, and the children loved the parents. However, the evidence set forth above, particularly that surrounding visitation, also made clear the negative effects on the children of interaction with the parents. This is substantial evidence supporting the juvenile court's determination that terminating parental rights would not be detrimental to the children.

The parents argue that the juvenile court improperly weighed who would be the better caregiver, the parents or the foster parents. "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home. [Citation.] Even where it may never make sense to permit the child to live with the parent, termination may be detrimental. [Citation.] And the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Caden C., supra*, 11 Cal.5th at p. 634.)

We conclude the juvenile court appropriately assessed whether the harm from severing the children's relationships with the parents outweighed the benefit to the children of permanent placement in adoptive homes, and concluded that it did not. (*Caden C., supra*, 11 Cal.5th at p. 631.) In so doing, the court determined that terminating parental rights served the children's best interests. (*Id*. at p. 632.) The court's observations concerning the placement homes were not made for the purpose of

21

judging a contest between the relative fitness of the parents versus the placement caregivers, but rather to address "whether losing the relationship with the parent[s] would harm the child[ren] to an extent not outweighed, on balance, by the security of a new, adoptive home[s]." (*Id*. at p. 634; see *id*. at p. 631.)

We conclude that the juvenile court's factual findings are supported by substantial evidence, and it did not abuse its discretion in determining that termination of parental rights would not be detrimental to the children. The juvenile court did not err in concluding the parents failed to meet their burden of establishing the applicability of the beneficial parental relationship exception.

II

*Termination Versus Guardianship*

Under separate headings, the parents argue that it was error for the juvenile court to terminate parental rights when guardianship was the appropriate permanent plan. The parents' arguments are, in effect, a reframing of their arguments that the juvenile court erred in concluding that the parents failed to establish the applicability of the beneficial parental relationship exception.

For example, mother argues that adoption "is not the only option available to a court, rather, it is a preference which is overcome by a strong parent-child relationship." She discusses the fact that the "Legislature has codified exceptions to the adoption preference, courts must engage in a comparative analysis," and that the courts must assess "the harm that would ensue to the children if their relationship with their parents were completely severed." That is what the juvenile court did in concluding that the beneficial parental relationship exception did not apply. Mother concludes that, "[i]n light of the modest benefits, if any, to be gained through adoption over guardianship in this case, and also the evidence of harm that would ensue from terminating the parental relationship, it was an abuse of discretion to weigh those factors in favor of adoption." This is (1) a slightly different framing of the beneficial parental benefit exception

22

argument, and (2) in effect, a request that reweigh the evidence, which, as a reviewing court, we do not do. (*In re Jaime R.* (2001) 90 Cal.App.4th 766, 774.)

The father's argument under this heading even more clearly states: "When a parent establishes that a statutory exception applied, as the parents did in this case through the testimonies of the boys, then adoption or termination of parental rights was no longer in the child's best interest. [Citations.] The court prejudicially erred in finding the beneficial parental exception inapplicable in this case."

We have concluded that the juvenile court did not err in concluding the parents failed to establish that the beneficial parental relationship exception applied.

We also disagree with the father's argument that the juvenile court abused its discretion by considering only two alternatives, adoption or long-term foster care, ignoring guardianship. Under section 366.26, "the court shall terminate parental rights to allow for adoption" unless one of the statutory exceptions is shown to apply. (*Caden C., supra*, 11 Cal.5th at pp. 630-631.) The court determined that the parents failed to establish "termination would be detrimental to the child[ren] for at least one specifically enumerated reason." (*Ibid*.) Therefore, the court properly terminated parental rights. Additionally, we note that the juvenile court's express denial of the request for guardianship demonstrates that it did not ignore this option.

Mother also makes arguments addressed to Ma.B.'s objections to termination, which we will address in part V below.

### III

### *Whether Parents' Actions Diminished Their Bond with the Children*

Under another separate heading, father makes, and mother joins in, another argument concerning the beneficial parental relationship exception. They argue the Department failed to meet its burden of proving that the parental actions which triggered dependency diminished the children's strong bond with the parents. The parents assert they were entitled to a finding that the exception applied. We disagree.

23

The Supreme Court in *Caden C.* specified that a parent's ongoing struggles with issues that led to dependency are not a categorical bar to application of the exception, and it is not the case that the exception only applies where a parent has made sufficient progress in addressing the issues that led to dependency. (*Caden C., supra*, 11 Cal.5th at p. 637.) The court disapproved of "opinions that have held issues leading to dependency (1) were relevant in their own right apart from their relevance to the elements of the exception; (2) were relevant because they led to dependency; or (3) were relevant simply because they might keep the parent from regaining custody." (*Id*. at p. 638, fn. 7.) However, the court also stated that issues "such as those that led to dependency often prove relevant to the application of the exception," and that a "parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Id*. at p. 637.)

In a passage emphasized by the parents, the juvenile court stated: " 'I do not believe [the parents'] consistent visits negate[] the reasons why the children are in care or prove that it would not be in the best interest of the children to terminate parental rights. [¶] Throughout the life of these cases, the parents have been unable to even progress to unsupervised contact with the children given the nature of the case and the nature of their behavior. [¶] I believe that the children deserve the permanency with their current resource homes rather than continuing to languish in foster care with a high level of visitation with the parents.' "

The parents argue that the juvenile court improperly used their ongoing struggles with the issues that led to dependency "as a basis for determining the fate of the parental relationship by assigning blame or making moral judgments about parental fitness." We conclude, however, that the court considered these issues as "relevant to the application of the exception." (*Caden C., supra*, 11 Cal.5th at p. 637.) Consideration of these issues suggested that "interaction between parent and child at least sometimes has a ' "negative" effect' on the child[ren]." (*Ibid*.) The children's apprehension about visitation, and their

24

negative behavior surrounding it, suggested that the issues that led to dependency contributed to negative effects on the children.

Contrary to the parents' arguments, the juvenile court did not determine the beneficial parental relationship exception did not apply, or terminate parental rights, because of the parents' conduct that led to dependency, and the court did not employ an incorrect burden of proof.

IV

*The Sibling Relationship Exception*

The parents argue that another exception, the sibling relationship exception, applied and foreclosed termination of parental rights. We again disagree.

The sibling relationship exception applies where the "court finds a compelling reason for determining that termination would be detrimental to the child" because there "would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) "The sibling relationship exception contains 'strong language creating a heavy burden for the party opposing adoption.' " (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437.) "The court considers the best interests of the adoptive child, not the best interests of other siblings." (*Id.* at p. 438.)

Thus, "[u]nder section 366.26, subdivision (c)(1)(B)(v), the juvenile court 'is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship . . . .' [Citations.] '*If* the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling

25

relationship against the benefit the child would receive by the permanency of adoption.' " (*In re D.O.* (2016) 247 Cal.App.4th 166, 173-174.)

"We apply the substantial evidence standard of review to the court's factual findings regarding the applicability of the sibling relationship exception, 'and the abuse of discretion standard to the court's weighing of competing interests.' " (*In re Isaiah S., supra*, 5 Cal.App.5th at p. 438.)

We first note that, because it proved impossible to place all eight children together, they were placed in four homes. The three boys were placed together, N.B. and So.B. were placed together, F.B. and Z.B. were placed together, and Sa.B. was placed alone. With each household planning to adopt the children placed therein, each of these groups would remain together.

As for whether the siblings were raised in the same home, their circumstances varied considerably based on their ages. As stated, when these proceedings commenced in 2022, Ma.B., the oldest child, was 12 years old and had lived at home with the parents for most of that time. B.B. was seven years old upon detention, the male Sam.B. was six, N.B. was five, the female Sa.B. was four, So.B. was three, F.B. was two, and Z.B. was 10 months old. By the time of the section 366.26 hearing in April 2025, the children had been in foster care for more than two and a half years. Thus, the two youngest children had been in foster care for longer than they lived with the parents and their siblings, and all of the children had spent a substantial portion of their lives in foster care.

The siblings did share a bond, although the nature of these bonds varied. The evidence suggests, not surprisingly, that each child shared closer bonds with siblings with whom he or she was housed. The boys expressed a desire to remain together. The juvenile court stated that it believed it to be in the best interests of the children to maintain their sibling bonds. It also acknowledged that "the individuals that are together share significant common experiences," and that, while Sa.B. was on her own, she shared experiences with her siblings during visitation.

26

The juvenile court stated that the attorney for the children noted the "homes where the children are now, . . . they will continue that sibling relationship, that sibling bond." In determining whether the sibling relationship exception applies, the juvenile court may consider "a proven history of, and expressed commitment to, sibling visits." (*In re D.O., supra*, 247 Cal.App.4th at p. 175.) The juvenile court stated that it believed that sibling visits "will continue once parental rights are terminated and the adoptions go forward."

On this point, CDSS in its adoption assessment reports stated that "Saturday visits between the children continue at the discretion of the foster parents of all of the children. These visits continue to facilitate a bond between the siblings and will continue after the children are ordered into permanent plans thus ensuring termination of parental rights will not sever any sibling relationships." According to addendum report number six, the four resource families had "developed strong connections with one another, and are committed to maintaining sibling contact outside of the current scheduled visits. They often meet at local venues for ice cream, food, and/or to celebrate holiday events. The resource families have committed to a minimum of once a month visitation." At the section 366.26 hearing, each of the three boys testified that they saw their sisters outside of the parent visits, and that, except for Sam.B., they saw them at a fast-food restaurant days earlier. The two older boys testified, in April 2025, that the prior sibling visit may have been three or four months earlier or "[l]ast year."

Having contemplated relevant considerations, the juvenile court found that the sibling relationship exception did not apply. Based on its finding that sibling visitation "will continue once parental rights are terminated and the adoptions go forward," the juvenile court impliedly found that termination of parental rights would not substantially interfere with the sibling relationships. We agree.

The parents argue that the juvenile court's failure to issue sibling visitation orders, and the Department's failure to provide for sibling visitation, "had a dramatic and unfortunate [e]ffect in the application of the [sibling relationship] exception . . . ." The

27

parents claim that, as of February 22, 2024, sibling visitation was not taking place. However, they do not provide a record citation for this factual averment. (See *County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 861 [appellate briefs must "provide a citation to the record for a factual assertion," and " '[w]e may disregard factual contentions that are not supported by citations to the record [citation] or are based on information that is outside the record' "]; see also rule 8.204(a)(1)(C).)

The parents note that, in a status review report dated November 16, 2023, a social worker reported having coordinated sibling visits among all four placement homes. The report states: "Social Worker . . . has coordinated separate sibling visits for all four foster homes to have just sibling visitation with each other. Social Worker . . . has also coordinated sibling visitation between [Ma.B.], [B.B.], and [Sam.B.] to have video calls with [Sa.B.]. Recently [Ma.B.], [B.B.], and [Sam.B.] asked that Social Worker . . . to coordinate a sleep over for them to have with [N.B.], and [So.B.'s] foster home. Social Worker . . . intends to coordinate this in the near future . . . . All foster families have consistent contact with one another, and share photos frequently regarding the children, how they are doing, and accomplishments they are achieving." The parents argue, however, that "no days, times or places were identified in the report." That these details did not appear in the report does not disprove the report's representations.

The parents conclude: "[T]here was an absence of any court order requiring sibling visitation. As a result, the foster parents did not facilitate that visitation other than one simple sibling meal together . . . one week prior to the Section 366.26 Hearing. Logic would dictate that if the foster parents didn't facilitate sibling visitation during the reunification period or permanency planning, it is highly unlikely the siblings will ever see each other if they are adopted by the separate families."

The parents have not established that the representations in the record were untrue. In our review, we do not "reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most

28

favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Courts have emphasized the "rarity with which the sibling relationship exception applies." (*In re D.O., supra*, 247 Cal.App.4th at p. 174.) We agree with the juvenile court that the parents failed to prove that the exception applied here.

V

*Ma.B.'s Objection to Termination of Parental Rights*

The parents state that Ma.B., who was 14 years old, objected to the termination of parental rights and testified that he did not want to be adopted if that meant losing his relationships with his parents and siblings. This, they argue, established the statutory exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(ii). We disagree.

The statutory exception in section 366.26, subdivision (c)(1)(B)(ii), applies where the court finds a compelling reason for determining that termination will be detrimental to the child because " '[a] child 12 years of age or older objects to termination of parental rights.' " It was the parents' burden to prove the applicability of the exception. (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1335.)

The juvenile court questioned Ma.B. at length about his wishes, as did the attorneys for the parents. Ma.B.'s responses conveyed some ambivalence and confusion. However, generally, while he expressed a desire to return home to the parents, he did not object to adoption. He ranked his choices, in order from most to least desirable: returning home to the parents, staying at his foster home while maintaining a relationship with the parents, and adoption with no relationship with the parents. He did not object to adoption. He stated that he was "fine being adopted by" his foster mother. While he expressed his desire to continue to have a relationship with his parents, he also stated that he would "be okay" if he could not see his parents again. Asked if it would be "in your

29

best [*sic*] to be adopted," "for you and your brothers," Ma.B. responded, "Yeah." He stated that he liked living with his foster parents, that "[i]t's great," and that they took good care of him. When the father's attorney asked if he had said he thought it was best for him to be adopted, he responded, "Yeah." When asked, "if you had the ability to say yes or no to whether you wanted to be adopted, what would you say," Ma.B. responded: "I would say, no. Yeah." In short, Ma.B. did not unequivocally object to adoption. (See *In re Christopher L., supra*, 143 Cal.App.4th at pp. 1334-1335 [child did not unequivocally object to termination of parental rights; substantial evidence supported juvenile court's finding that the exception did not apply].)

The parents argue that Ma.B. was not "provided with clarification of his legal rights as late as April 1, 2025," and that the juvenile court was obligated to inform Ma.B. of all of his options. They emphasize his testimony expressing uncertainty about the nature of his relationship with the parents in the event he was adopted. They also emphasize the children's attorney's statement to the court that he "did not speak to [Ma.B.] after the testimony. I did not want to influence him or change anything that the Court had heard." Counsel continued, "I heard that he did want to continue contact. . . . And, you know, the benefit from continuing contact, I don't feel even in [Ma.B.'s] case, is going to be appropriate."

Ma.B. addressed three "options," including returning home; staying in foster care while still having a relationship with the parents, which would involve guardianship; and adoption with no ongoing relationship with his parents. He ranked the latter as his least desirable option. But the fact remains that he was aware of all of these options, he had ambivalent feelings about adoption, and he did not unequivocally object to adoption. (See *In re Christopher L., supra*, 143 Cal.App.4th at pp. 1334-1335.)

Additionally, as suggested when the juvenile court briefly touched on whether Ma.B. objected to adoption, even if Ma.B. had unequivocally objected, the court still would have had to find that Ma.B.'s objection gave rise to "a compelling reason for

30

determining that termination would be detrimental to the child . . . .”  (§ 366.26, subd. (c)(1)(B)(ii).)  Analogizing to the beneficial parental relationship exception, the parents argue that the juvenile court erred.  They state that the Supreme Court in *Caden C.* criticized “double consideration” by courts, and that the Supreme Court “*specifically disapproved of prior opinions which had engaged in that practice.*”  However, contrary to the parents’ suggestion, this subdivision does not create an older child “veto.”

The Supreme Court in *Caden C.* stated that, once the applicability of the beneficial parental relationship exception had been established based on the three elements it identified, the exception applied, and courts do not undertake to *further* determine whether an additional “compelling reason” supports applying the exception.  (*Caden C., supra*, 11 Cal.5th at pp. 635-637 & fn. 5.)  However, derived from the language of section 366.26, the beneficial parental relationship exception discussed in *Caden C.* includes the third element, that “the termination of parental rights would be *detrimental* to the child.” (*Caden C.,* at p. 631; see § 366.26, subd. (c)(1)(B).)  And in “assessing whether termination would be *detrimental,* the trial court must decide whether the harm from severing the child’s relationship with the parent outweighs the benefit to the child of placement in a new adoptive home.” (*Caden C.,* at p. 632.)

Based on the same statutory language, for the older child objection exception to apply, the parents had to establish that termination of parental rights over Ma.B.’s unequivocal objection would be detrimental to him.  (§ 366.26, subd. (c)(1)(B)(ii).)  We conclude the parents failed to make that showing.  Based on Ma.B.’s ambivalent attitudes toward adoption, and the absence of proof that termination of parental rights would be detrimental, we conclude that the parents failed to satisfy their burden of proving the applicability of the older child objection exception.  (See § 366.26, subd. (c)(1)(B)(ii).)

Lastly, we reject the parents’ additional contention, raised under another separate heading, that reversal is required to enable the juvenile court to properly apply *Caden C.*

and the section 366.26 exceptions.  We have concluded the juvenile court did not err in its consideration of the section 366.26 exceptions and in applying *Caden C.*

VI

*Appointment of One Attorney for All Children*

The parents argue that the juvenile court erred in appointing only one attorney for all eight children.  The parents claim that there was a reasonable likelihood that an actual conflict of interest would arise among the siblings.  We disagree.

"When first appointing counsel in a dependency matter, the court may generally appoint a single attorney to represent all the siblings."  (*In re Celine R.* (2003) 31 Cal.4th 45, 58 (*Celine R.*); see rule 5.660(c)(1)(A).)  The juvenile court "would have to appoint separate attorneys if, but only if, there is an actual conflict among the siblings or if circumstances specific to the case—not just the potential for conflict that inheres in all multisibling dependency cases—present a reasonable likelihood an actual conflict will arise."  (*Celine R.,* at p. 58; see rule 5.660(c)(1)(B).)  "If these specific circumstances exist, the court should appoint separate counsel at the outset rather than await an actual conflict and the possible disruption a later reappointment may cause."  (*Celine R.,* at p. 58.)  "After the initial appointment, the court will have to relieve counsel from multiple representation if, but only if, an actual conflict arises."  (*Ibid.*)  "It is not necessary for an attorney to withdraw from representing some or all of the siblings if there is merely a reasonable likelihood that an actual conflict of interest will develop."  (Rule 5.660(c)(2)(C).)  "A conflict arises where minor's counsel seeks a course of action for one child with adverse consequences to the other."  (*In re Barbara R.* (2006) 137 Cal.App.4th 941, 953.)

The parents argue that, between the time attorney Wahlberg was appointed on September 29, 2022, and when attorney Vasquez was appointed to replace him on January 11, 2024, "numerous reports and hearings were held identifying numerous circumstances specific to this case which presented a reasonable likelihood that an actual

32

conflict of interest would arise among the siblings mandating the appointment for separate counsel for the siblings, or at a minimum, the sibling groups." However, the only argument the parents make specific to this case relies on section 361.2 and its requirement of sibling visitation. The parents argue: "The department failed to address sibling visitation and the appropriateness of the separate placements of the children in separate counties. The juvenile court orders failed to include mandated sibling visitation orders, and the record does not reflect the issues ever being addressed before the appointment of Attorney Vasquez. These are circumstances specific to this case and represented a reasonable likelihood that an actual conflict of interest would arise among the siblings."

What the parents do not do, however, is adequately explain, based on "circumstances specific to the case" (*Celine R., supra*, 31 Cal.4th at p. 58), how there was a reasonable likelihood that an actual conflict of interest would arise among the siblings and what the nature of that conflict was (see generally rule 5.660(c)(1)(B)(ii)). Instead, they only state that sibling visitation was not ordered, and then assert in conclusory fashion that these circumstances "represented a reasonable likelihood that an actual conflict of interest would arise among the siblings." Under the rules of appellate procedure, " '[w]e may disregard legal arguments that are not supported by citations to legal authority [citation] or are conclusory [citation].' [Citations.] Further, we may treat a point that is not supported by cogent legal argument as forfeited.' " (*County of Sacramento v. Singh, supra*, 65 Cal.App.5th 858, 861; see rule 8.204(a)(1)(B).) We do so here.

VII

*Ineffective Assistance of Counsel*

The parents argue that the children were deprived of the effective assistance of counsel. They argue that there existed an actual conflict of interest because the parents argued the beneficial parental relationship exception and the sibling relationship

33

exception, and the boys' testimony supported their arguments. They argue that Vasquez was ineffective because he: failed to protect the children's right to placement together; failed to advance compelling arguments in favor of guardianship for the boys; and failed to communicate with Ma.B. in the lead up to termination of parental rights. The Department argues that the parents lack standing to raise ineffective assistance of the children's counsel. Even assuming the parents have standing to raise the issue, they again fail (1) to satisfy the requirements of appellate procedure, and (2) to demonstrate prejudice.

The rules of appellate procedure require, among other things, citation to authority, if possible, and "a citation to the record for a factual assertion. [Citations.] '[W]e may disregard factual contentions that are not supported by citations to the record [citation] or are based on information that is outside the record." (*County of Sacramento v. Singh, supra*, 65 Cal.App.5th at p. 861; see rule 8.204(a)(1)(C).) In the section of her brief devoted to this claim, the mother includes a single citation to the record, despite advancing several factual contentions.

In any event, to prevail on a claim of ineffective assistance of counsel, a party must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced that party. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To show prejudice, the party must show a reasonable probability that he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland,* at pp. 693-694; *Ledesma,* at pp. 217-218.)

In the assertions addressed to prejudice, the parents argue, "it can be maintained with confidence that a different result had Attorney Vasquez zealously advocated for a single or fewer placements and certainly for sibling visitation termination of parental rights would not have resulted had all the children been provided strong and impartial advocacy on their own behalf. The prejudice of lifelong separation is a foreseeable

34

certainty." Later, they argue that the "inevitable sibling rivalry" that would ensue if Ma.B. successfully objected to adoption while B.B. and Sam.B. were adopted "would be avoided if parental rights were not terminated and guardianships were established, but Attorney Vasquez did not present strong arguments that were available in support of guardianship for the boys."

None of these cursory arguments are sufficient to establish that, even assuming for argument's sake that the children's attorney's performance fell below an objective standard of reasonableness under prevailing professional norms, there was a reasonable probability that any or all of the children would have achieved a more favorable result had counsel's performance not been deficient.

VIII

*ICWA Compliance*

The parents argue that the Department failed to comply with the inquiry requirements of the ICWA, and the juvenile court erred because it did not ensure the Department complied with the ICWA. We agree.

"The juvenile court and child welfare agency 'have "an affirmative and continuing duty" in every dependency proceeding to determine whether ICWA applies by inquiring whether a child *is or may be* an Indian child.' [Citations.] The duty to inquire begins with the initial contact with the reporting party, and it continues with the child welfare agency's 'first contact with the child and each family member, including extended family members.' [Citations.] The duty of inquiry continues throughout the dependency proceedings." (*In re Claudia R.* (2025) 115 Cal.App.5th 76, 84 (*Claudia R.*).)

"Under section 224.2, subdivision (b)(2), once a child is placed into the temporary custody of a 'county welfare department,' the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' [Citations.] An 'extended family

35

member,' if not defined by the law or custom of the child's Indian tribe, includes 'a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' " (*Claudia R., supra*, 115 Cal.App.5th at pp. 84-85.)

"The duty of further inquiry is triggered under section 224.2, subdivision (e), '[i]f the court, [or] social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child.' [Citations.] Further inquiry includes '(1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe.' " (*Claudia R., supra*, 115 Cal.App.5th at p. 85.)

An agency also has a duty to document its inquiry in compliance with rule 5.481(a)(5). (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1136 (*Dezi C.*).)

We review claims of inadequate inquiry into a child's Native American ancestry for substantial evidence. (§ 224.2, subd. (i)(2); *H.A. v. Superior Court* (2024) 101 Cal.App.5th 956, 961; *Dezi C., supra*, 16 Cal.5th at p. 1134.) "[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.,* at p. 1141.) " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101-1102.)

Father filed parental notification of Indian status forms (ICWA-020) for each child except for Ma.B., checking the box concerning Indian status indicating that "[n]one of the

36

above apply." Father grew up in India and did not immigrate to the United States until he was 17 years old. Ma.B.'s father filed an ICWA-020 form as to Ma.B., also checking the box indicating that "[n]one of the above apply."

Mother filed ICWA-020 forms as to each child, and checked the box stating, "I am or may be a member of, or eligible for membership in, a federally recognized Indian tribe." According to the Department, on October 12, 2022, a legal secretary called the mother. The mother stated that she may have eligibility in the Cherokee tribe and another tribe.

The Department filed a notice of child custody proceeding for Indian child form (ICWA-030) for each child, stating that the children were or may be eligible for membership in the Cherokee or Nansemond tribes. The completed ICWA-030 forms included the names of the parents, the maternal grandparents, and the maternal great-grandparents, as well as any known address and date and place of birth information. Notice was provided to the Sacramento Area Director of the Bureau of Indian Affairs, the United Keetoowah Band of Cherokee, the Nansemond Indian Tribe, the Eastern Band of Cherokee Indians, and Cherokee Nation. Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee responded that the children were not members and not eligible. No response was noted for the Nansemond Indian Tribe. The Department re-noticed the Nansemond Indian tribe.

In an October 23, 2024, letter to the juvenile court, a social worker stated that the mother's sister reported that there may be Native American ancestry in the Cherokee tribe on their mother's side, and identified two relatives by name who may have been Native American. She stated that no one in her family was enrolled in a Native American tribe, and no one had lived on a Native American reservation. According to addendum report number two, a maternal aunt stated that she had no Native American ancestry, tribe membership, or eligibility, but stated that she believed the mother's mother was an enrolled member of the Cherokee tribe.

37

On January 28, 2025, the legal secretary contacted the United Keetoowah Band of Cherokee Indians, Eastern Band of Cherokee Indians, and Cherokee Nation to inquire about the mother, and all three responded that she was not an enrolled member.

The Department did make some effort to comply with the ICWA inquiry requirements. However, as mother argues, there are many maternal relatives the Department was aware of in reference to whom there is no record that it made ICWA inquiries. These relatives included, among others, several of the mother's 12 living siblings. "Agencies are already tasked with investigating the circumstances underlying the child's removal and identifying and locating the child's extended family members [citation]; it is a rather simple task to ask those family members about Indian ancestry in this process. In fact, courts have characterized the duty of inquiry as 'slight and swift.' " (*Dezi C., supra*, 16 Cal.5th at p. 1143.) "Thus, the *Dezi C.* court envisioned that a child welfare agency's investigation would include an investigation into the circumstances of the referral *and* the extended (and other) family members for purposes of placement of the child and ICWA." (*Claudia R., supra*, 115 Cal.App.5th at p. 87.) Section 224.2 " 'does not require the agency to "find" unknown relatives and others who have an interest in the child, merely to make reasonable inquiries.' " (*Dezi C.,* at p. 1140.) However, the " 'operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.' " (*Ibid*.)

We conclude there is no substantial evidence that the Department's ICWA inquiry was adequate, and the juvenile court erred in determining that the Department satisfied the requirements of the ICWA. We will conditionally reverse the orders terminating parental rights and remand for the limited purpose of compliance with the inquiry and notice provisions of the ICWA.

## IX

### *Cumulative Error*

The parents argue that reversal is required based on the cumulative effect of the juvenile court's errors. We have found no error beyond that related to the Department's ICWA inquiry. Thus, there are no additional errors to aggregate. We reject the parents' cumulative error claim. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305; see also *People v. Richie* (1994) 28 Cal.App.4th 1347, 1364, fn. 6.)

## X

### *Reversal as to One Parent Mandates Reversal as to the Other Parent*

The parents argue that reversal of the termination of parental rights of one parent mandates reversal as to the other parent. We are not, however, outright reversing as to either parent. The parents' argument is moot.

## DISPOSITION

The orders terminating parental rights are conditionally reversed, and the matter is remanded for the limited purpose of complying with the inquiry and notice provisions of the ICWA, as well as the requirements of sections 224.2 and 224.3 and the documentation provisions of rule 5.481(a)(5).  If the juvenile court thereafter finds a further inquiry was proper and adequate, due diligence has been conducted, and concludes the ICWA does not apply, the orders shall be reinstated.  If, however, the juvenile court concludes the ICWA applies, the juvenile court is ordered to conduct a new section 366.26 hearing and proceed in accordance with the ICWA and California implementing provisions.

                                                   \s\
                                             Krause, J.


We concur:


    \s\
Earl, P. J.


    \s\
Mauro, J.